UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEAR CORPORATION,

        Plaintiff(s),

v.

LH TRUCKING, INC.,

        Defendant(s).

_____/

Case No. 05-74477

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [44] AND
GRANTING IN PART AND DENYING IN PART PLAINTIFF'S CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT [62]**

Plaintiff Lear Corporation filed this breach of contract action in Michigan state court.

Defendant LH Trucking, Inc., removed the case to federal court and asserted a breach of

contract counter-claim. Plaintiff claims that Defendant breached the contract when it

overcharged Plaintiff for trucking services. Defendant claims that Plaintiff breached the

contract when it stopped paying Defendant as an "off-set" for the alleged overcharges.

This matter comes before the Court on the parties' cross-motions for partial summary

judgment.[1] For the reasons discussed below, each motion is GRANTED IN PART AND

DENIED IN PART.

**I.    Facts**

Plaintiff is a Delaware corporation with its principal place of business in Oakland

County, Michigan. (Def.'s Mot. at 2; Am. Compl. ¶1.) Defendant is an Ohio corporation

_____

[1]Both parties agree that the amount of damages at issue in this case cannot be resolved
by these motions.

with its principal place of business in Mason, Ohio. (Def.'s Mot. at 2; Am. Compl. ¶ 2.) In April 1998, the parties entered into a contract under which Defendant would transport Plaintiff's freight, via tractor-trailer trucks, to various locations. (Def.'s Mot. at 2; Pl.'s Resp. at 1.) In 2001, the parties renewed the contract; the new contract is identical to the 1998 contract in every respect relevant to these motions. (Def.'s Mot. at 2; Pl.'s Resp. at 4.) The contracts expressly incorporate three appendices that govern the prices to be charged for various trucking routes. (*Id.*) The contracts were amended from time to time when a new route was added to the appendices. (Def.'s Mot. at 2.)

Appendix I to both contracts establishes flat rates for "Point-to-Point" shipments between various cities. (*See* Def.'s Mot., Ex. 1 at 3; Pl.'s Resp., Ex. I.) Appendix II sets forth "Mileage Truckload Rates" for non-specific runs within or between various states. (*See* Def.'s Mot., Ex. 1 at 6; Pl.'s Resp., Ex. J.) For these shipments, rates are calculated based on the number of miles traveled. (*Id.*) Appendix III establishes the "Rules" to be used to calculate rates. (*See* Def.'s Mot., Ex. 1 at 4; Pl.'s Resp., Ex. K.) It states that "Appendix I mileage rates take precedence over Appendix II mileage rates." (*Id.* at Item # 3.) It also contains an item titled "Stop Off Charge," which states that "[s]top off shipments will be rated on circuitous miles, at the cost per mile based on the Point to Point rate, plus Stop off charges." (*Id.* at Item # 6.) The stop off charge is set at $40 per stop. (*Id.*)

Under these contracts, Defendant would submit invoices to Plaintiff's agents and would receive weekly checks in return. (Def.'s Mot. at 3.) In order to be paid, Defendant claims, the invoice would either have to identify a specific route from Appendix I, or it would

have to be accompanied by documentation from Plaintiff that approved a route not listed in Appendix I.  (*Id.*)

The parties entered into a new contract in 2005.  (Def.'s Mot. at 3; Pl.'s Resp. at 5.) The contract incorporates "addenda" and "rate sheets" to establish the appropriate rates for various routes.  (Def.'s Mot., Ex. 3; Pl.'s Resp., Ex. M.)  This contract refers to "point-to-point" rates as "lane specific," and to "mileage truckload rates" as "global."  The contract states:

> In the event [Defendant] has both a lane specific and a global agreement, the rates set forth in the lane specific agreement shall take precedence over the global rates.  Shipments with multiple stops in route, where a point-to-point price is provided in Addendum B, shall be invoiced at the equivalent cost per mile rate for the point-to-point flat charge movement price.  The incremental charges (out of route miles over and above the point-to-point mileage, stop-offs) over and above the flat charge shall be billed as a separate line item(s) on the freight bill.

(*Id.* § 12.2.)

The controversy in this case centers on Defendant's billing practices for "milk runs." A "milk run" is a multi-stop trip.  (Pl.'s Resp. at 3.)  For example, a truck will go from point A to point B (and possibly back), with stops along the way at points C, D, E, and F.  In 2005, Plaintiff discovered that Defendant was billing such a trip as numerous separate trips. Thus, Defendant would submit invoices for a trip from point A to B, A to C, A to D, A to E, and A to F.[2]  (*See* Pl.'s Resp., Ex. A; T. Lang Dep. Tr. at 85-95.)  Indeed, Defendant concedes that this was its "consistent practice" and argues that it was "required" by the contracts to bill in this fashion.  (Pl.'s Resp., T. Lang Dep. Tr. at 114; Def.'s Mot. at 3.)  This

---

[2]When it submitted these multiple invoices, Defendant typically charged one route as a round trip and the rest as one-way trips.  (Pl.'s Resp. at 2; Exs. B-D.)

practice led to Plaintiff being charged for far more miles than actually were driven. For instance, in the example found at Plaintiff's Exhibit A, the invoices suggested that Defendant had driven 1625 miles when, in fact, Defendant had only driven approximately 530 miles. (T. Lang Dep. Tr. at 85-95.) Additionally, the invoices included a fuel surcharge (typically between 12 and 16%) for the invoiced mileage. (Pl.'s Resp., Ex. A - D.)

Plaintiff argues that these types of trips should have been billed as a point-to-point shipment between the two farthest points (points A and B), plus a stop-off charge for each additional stop (at points C, D, E, and F), and a charge for any additional miles driven to reach those points. (Pl.'s Resp. at 3, 9.)

On September 9, 2005, Plaintiff confronted Defendant about its billing practices. (Def.'s Mot. at 4; Pl.'s Resp. at 1.) Defendant denied any wrongdoing; consequently, Plaintiff "refused to pay the then outstanding invoices from [Defendant] because [Plaintiff] estimated that its payment of fictitious invoices exceed any balance then due [Defendant]." (Pl.'s Resp. at 1.) Plaintiff asserts that Defendant "initially offered to reimburse [Plaintiff] for the fictitious invoice payments and agreed to re-submit invoices to reflect the correct amount due," but never followed through. (*Id.*) Defendant, on the other hand, states that Plaintiff "promised . . . that it would pay as much as $250,000 of the unpaid invoices, [but] that never happened." (Def.'s Mot. at 5.) On October 11, 2005, Defendant informed Plaintiff that it could not continue to perform unless it was paid.[3] (*Id.*) This litigation ensued.

---

[3]According to Defendant, Plaintiff still owes approximately $700,000 in unpaid invoices. (Def.'s Mot. at 5.)

This matter is now before the Court on the parties' cross-motions for partial summary judgment.

## II.    Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56©) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.    Analysis

As noted above, both parties assert breach of contract claims in this case. The Court will address Plaintiff's claim first.

## A. Plaintiff's Claim

Plaintiff's claim is premised upon Defendant's alleged overcharging for services rendered under the various contracts. The Court will consider the merits of Plaintiff's claim before addressing Defendant's numerous affirmative defenses.

Under Michigan law, "[t]he primary goal in interpreting contracts is to determine and enforce the parties' intent." *Old Kent Bank v. Sobczak*, 620 N.W.2d 663, 666-67 (Mich. Ct. App. 2000) (citation omitted). "To do so, this Court reads the agreement as a whole and attempts to apply the plain language of the contract itself." *Id.* at 667 (citation omitted). "If the contractual language is unambiguous, courts must interpret and enforce the contract as written because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Trust*, 745 N.W.2d 754, 758 (Mich. 2008). A contract is ambiguous "when its words may reasonably be understood in different ways." *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915, 919 (Mich. 1999). Additionally, a contract "must still be viewed as a whole, its provisions read to give meaning to each, and conflicts between provisions reasonably harmonized. An interpretation of the contract which would render it unreasonable should be avoided." *Pearson v. Provident Life & Acc. Ins. Co.*, No. 204889, 1999 WL 33455091, at *5 (Mich. Ct. App. Jan. 22, 1999) (citing *Fresard v. Mich. Millers Mut. Ins. Co.*, 327 N.W. 2d 286, 289 (Mich. 1982)).

Here, Plaintiff argues that the plain language of the contract required Defendant to bill milk runs as point-to-point runs between the farthest points, with additional charges for stop-offs and extra mileage. Defendant, on the other hand, argues that the plain language

6

of the contract required it to bill milk runs as separate individual trips to each location. The basis of Defendant's argument is the language in the contracts that point-to-point (or lane specific) rates take precedence over mileage truckload (or global) rates. (*See* Def.'s Mot., Ex. 1 at 4; Pl.'s Resp., Ex. K.; *see also* Def.'s Mot., Ex. 3 §12.2; Pl.'s Resp., Ex. M §12.2.)

Defendant's position is undercut by two primary weaknesses. First, despite Defendant's repeated assertions to the contrary,[4] Plaintiff does not argue that the global rates should have applied to milk runs. Indeed, Plaintiff explicitly states that it "agrees that the point-to-point/lane specific rates apply." (Pl.'s Resp. at 9.) Plaintiff's position, rather, is that the farthest point-to-point rate should have been charged one time only, with additional stop-off and mileage charges added.

The second, and more important, weakness in Defendant's position is that it ignores an entire provision of each contract. From 1998 to 2005, the parties were governed by a contract that stated, "Stop off shipments will be rated on circuitous miles, *at the cost per mile based on the Point To Point rate,* plus Stop off charges." (Def.'s Mot., Ex. 1 at 4; Pl.'s Resp., Ex. K) (emphasis added). The contract that governed the parties' relationship from 2005 forward stated:

> Shipments with multiple stops in route, where a point-to-point price is provided in Addendum B, shall be invoiced at the equivalent cost per mile rate for the point-to-point flat charge movement price. The incremental charges (out of route miles over and above the point-to-point mileage, stop-offs) over and above the flat charge rate shall be billed as a separate line item(s)."

---

[4]Defendant asserts that the contracts required it "to charge lane-specific rates, not the global rates as Plaintiff alleges." (Def.'s Mot. at 8.) Defendant also argues that Plaintiff's claim fails because the "contracts provide that the dedicated, lane-specific routes take precedence at all times." (*Id.* at 8-9.)

(Def.'s Mot., Ex. 3 §12.2; Pl.'s Resp. at Ex. M §12.2.)

Defendant never attempts to reconcile these provisions with its proposed interpretation of the contracts; indeed, Defendant never acknowledges the 1998/2001 provision at all. These provisions explicitly support Plaintiff's argument. Milk runs, or runs with "stop off shipments" or "multiple stops in route," were required by the plain language of the contracts to be billed using the point-to-point rate, plus additional charges for stop-offs and additional mileage. Thus, if these provisions are to be given meaning, Plaintiff's interpretation must prevail.

Further, were Defendant's position correct, that would mean that the contract required Defendant to charge, and Plaintiff to pay, for services that never were performed, mileage that never was driven, and fuel that never was used.[5] This interpretation would render the contract unreasonable and should therefore "be avoided." *Pearson,* 1999 WL 33455091, at *5.

In a final attempt to support its position, Defendant provides the affidavit of Duff H. Swain. (Def.'s Reply, Ex. D.) Defendant claims that Mr. Swain states that Defendant's billing practice was "standard." (Def.'s Reply at 3.) Mr. Swain's affidavit, however, is based on a scenario in which Defendant sends one truck on "five, dedicated point-to-point runs." (*Id.*, Ex. D ¶ 9(D).) In that situation, Mr. Swain asserts, it would be industry standard for Defendant to submit "five separate invoices charging the respective point-to-point rates for

---

[5]When this controversy first came to light, Defendant prepared a spreadsheet that calculated the difference between what Defendant actually charged and what it would have charged if it used Plaintiff's approach. (Pl.'s Resp., Ex. E.) That document shows that, over a twelve month period ending in October 2005, Defendant's billing practice resulted in excess charges to Plaintiff of over $70,000. (*Id.*)

the five dedicated runs, rather than a single invoice charging the farthest point-to-point rate, plus charges for four additional stop offs and mileage in excess of the farthest point-to-point distance." (*Id.* ¶ 10.) Plaintiff does not disagree. (Pl.'s Reply at 1.) For in this hypothetical, Defendant's truck would have driven the following routes: A-B-A, A-C-A, A-D-A, A-E-A, and A-F-A. In that situation, Plaintiff concedes that five separate invoices would be appropriate. (*Id.* at 2.) At issue in this case, however, is a situation where Defendant's truck drove A-B-C-D-E-F-A. In that situation, the plain language of the contracts prohibits Defendant from billing for five separate trips.

Because "the contractual language is unambiguous, [this Court] must interpret and enforce the contract as written." *In re Smith Trust*, 745 N.W.2d at 758. Accordingly, the Court concludes that Defendant breached the relevant contracts when it billed milk runs as separate individual trips.

### 1. Defendant's Affirmative Defenses

Defendant argues that Plaintiff's claim is barred by various affirmative defenses: the doctrines of waiver or forfeiture, ratification, estoppel, and laches; failure to comply with contractual conditions precedent; because they are pre-empted by federal law; and because they are time-barred. The Court will consider each defense in turn.

### a. Waiver of Forfeiture

Defendant argues that "Plaintiff waived or forfeited its alleged contract claims against [Defendant] through Plaintiff's regular course of conduct." (Def.'s Mot. at 10.) The thrust of Defendant's argument is that because it has submitted charges to Plaintiff in the same

way since 1998, and because Plaintiff reviewed the invoices for accuracy and yet still paid Defendant, "Plaintiff's regular course of conduct was to accept the invoices as properly billed." (Def's Mot. at 11.) Accordingly, Defendant argues, Plaintiff cannot now assert that Defendant breached the contracts.

Waiver is "an intentional abandonment of a known right." *Roberts v. Mecosta County Gen. Hosp.*, 642 N.W.2d 663, 668 n.4 (Mich. 2002). Forfeiture is "the failure to assert a right in a timely fashion." *Id.* at 670. Defendant argues that Plaintiff had a "duty" to immediately assert its rights when it discovered the relevant breach of contract. (Def.'s Mot. at 10.)

Assuming Defendant is correct, its argument still fails. First, Defendant does not assert or offer any evidence to establish that Plaintiff intentionally abandoned its right to assert a breach of contract. The same is true with respect to whether Plaintiff knew of the breach before 2005. Defendant simply points out that Plaintiff was responsible for making sure the invoices were accurate. (*Id.* at 11.) Defendant's president, however, admitted that an individual who reviewed the invoices would think that Defendant sent individual trucks on individual runs to each location, rather than having sent one truck that made multiple stops. (Pl.'s Resp., T. Lang. Dep. Tr. at 112.) Simply put, Defendant's breach would not have been discovered by reviewing the invoices for accuracy. Thus, Plaintiff's claim that it did not discover Defendant's breach until 2005 remains uncontradicted.

Defendant asserts that once Plaintiff discovered the alleged breach, "Plaintiff had a choice to either continue performing under the contract or cease to perform." (*Id.* at 11.) This is precisely what Plaintiff did. In Defendant's own words, Plaintiff "accused [Defendant] of overcharging" and "stopped paying [Defendant]'s invoices." (*Id.* at 4-5.)

Thus, Defendant's waiver and forfeiture arguments fail.

### b. Ratification

Defendant also argues that Plaintiff "ratified the charges submitted by [Defendant] for failing to allege a breach for seven years." (Def.'s Mot. at 11.) This defense also fails, for "[t]here can be no ratification, where all material elements of the transaction are not fully known." *Moore v. Mitchell*, 270 N.W. 197, 202 (Mich. 1936). Again, Defendant has failed to offer any evidence that Plaintiff knew of its billing practices before 2005. Instead, Defendant repeats its charge that Plaintiff must have known of the practices because it reviewed the invoices. As discussed above, however, this is an insufficient evidentiary basis by which to establish Plaintiff's actual knowledge of Defendant's breach. Accordingly, this affirmative defense fails.

### c. Estoppel

Defendant's next defense is that Plaintiff is estopped from asserting its breach of contract claim because "Plaintiff either intentionally or negligently permitted [Defendant] to believe it was properly submitting charges under the terms of the applicable contracts." (Def.'s Mot. at 13.) This argument is premised upon Plaintiff's silence in the face of Defendant's billing practices.

Unfortunately for Defendant, "[a]n essential element of estoppel is that a party *knowingly* permitted the opposite party to act to its own disadvantage." *Commercial Union Ins. Co. v. Med. Protective Co.*, 356 N.W.2d 648, 653 (Mich. Ct. App. 1984) (emphasis added) (citation omitted). Additionally, "unless a person knows there is occasion for him to speak or act, his silence or passivity will not conclude him." *Detroit Hilton Ltd. P'ship v.*

*Dep't of Treasury*, 373 N.W.2d 586, 589 (Mich. 1985) (citation omitted).  As a result, this affirmative defense fails for the reasons stated above.

### d.  Laches

Defendant also contends that Plaintiff's claim is barred by the doctrine of laches. Laches "depends principally on the requisite of intervening circumstances that would render inequitable any grant of relief to the dilatory plaintiff." *In re Contempt of United Stationers Supply Co.*, 608 N.W.2d 105, 109 (Mich. Ct. App. 2000) (citation omitted).  To prevail in this defense, Defendant must "prove a lack of due diligence on the part of the plaintiff resulting in some prejudice to the defendant." *Gallagher v. Keefe*, 591 N.W.2d 297, 300 (Mich. Ct. App. 1998) (citation omitted).

Defendant's laches argument, like all of its preceding arguments, is based on the fact that Plaintiff did not discover Defendant's billing practices earlier.  Defendant has failed to show, however, that due diligence by Plaintiff would have uncovered the way in which Defendant submitted its invoices.  Indeed, as already discussed above, Defendant's president conceded that a review of the invoices would not have revealed that Defendant was billing milk runs as though multiple trucks had made multiple trips.  Further, "[a] defrauded party does not owe to the party who defrauds him an obligation to use diligence to discover the fraud." *Lewis v. Jacobs,* 117 N.W. 325, 326 (Mich. 1908) (citation omitted). Accordingly, Defendant's laches argument fails.

### e.  Contractual Conditions Precedent

Defendant's next defense is that Plaintiff's claim is barred because "Plaintiff failed to comply with the contractual conditions precedent."  (Def.'s Mot. at 14.)  First, Defendant notes that the 2005 contract requires "[a]ny and all notices *required or permitted to be given*

12

*under this Agreement* [to] be in writing and [to] be delivered . . . by U.S. certified mail."
(Pl.'s Resp., Ex. M ¶ 19) (emphasis added).  The agreement, however, does not require
or permit written notice to be given when an invoice is contested or before litigation may
be commenced.  Thus, Plaintiff has not failed to comply with any condition precedent in the
2005 contract.

With respect to the 1998/2001 contract, it requires Plaintiff to submit claims in writing
"for loss, damage, injury or delay *to cargo.*"  (Def.'s Mot., Ex. 1 ¶ 15; Pl.'s Resp., Ex. G ¶
15) (emphasis added).  Plaintiff's claim, however, is not based on any loss, damage, injury,
or delay to cargo; it is based on Defendant's billing practices.  Accordingly, Plaintiff was not
required to submit the claim to Defendant in writing.

### f.  Pre-emption

Defendant also argues that Plaintiff's claim is pre-empted by federal law.  Specifically,
Defendant argues that Plaintiff's claim is pre-empted by the Carmack Amendment, 49
U.S.C. § 14706; its pre-emption provision, 49 U.S.C. § 14501(c); and relevant case law.
At the outset, the Court notes that the terms of 49 U.S.C. § 14501(c) do not by themselves
prohibit Plaintiff's claim.  That section provides that no state may enact or enforce a law or
regulation "related to a price, route, or service of any motor carrier . . . with respect to the
transportation of property."  The provision "does not expressly forbid state law *claims*," but
rather focuses on state *law and regulation.  Cent. Transp. Int'l v. Sterling Seating, Inc.*, 356
F. Supp. 2d 786, 788 (E.D. Mich. 2005) (emphasis added).  "No part of the section prevents
a state law claim on contract [related to] shipping charges."  *Id.*  Thus, Plaintiff's claim is not
barred by § 14501(c).

This does not end the Court's inquiry, however, for as Defendant points out, the Supreme Court has held that, with respect to interstate shipping, "[a]lmost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it." *Adams Express Co. v. Croninger*, 226 U.S. 491, 505-06 (1913). Further, while the text of the Carmack Amendment refers only to "actual loss or injury to . . . property," the Sixth Circuit has interpreted the statute broadly and has held, "when damages are sought against a common carrier for failure to properly *perform* . . . an interstate contract of carriage, the Carmack Amendment governs." *Am. Synthetic Rubber Corp. v. Louisville & Nashville R.R. Co.*, 422 F.2d 462, 466 (6th Cir. 1970) (emphasis added).

While the trucking industry was subject to heavy government regulation when these cases were decided, this is no longer true. "In 1995 the Congress found that motor carriage had become a 'mature, highly competitive industry where competition disciplines rates far better than tariff filing and regulatory intervention,' and that rate regulation was no longer necessary except for '[two] specialized categories of trucking operations.'" *Munitions Carriers Conference, Inc. v. United States*, 147 F.3d 1027, 1029 (D.C. Cir. 1998) (citing S. Rep. No. 104-176, at 10 (1995)). As a result, Congress enacted the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. ch. 137, the purpose of which was "the *deregulation* of the rail and motor carrier industries." *Cent. Transp. Int'l*, 356 F. Supp. 2d at 788 (emphasis original) (citing *Fitzpatrick v. Morgan S., Inc.*, 261 F. Supp. 2d 879, 982 (W.D. Tenn. 2003)); *see also Arctic Express, Inc. v. Del Monte Fresh*

*Produce NA, Inc.*, 366 B.R. 786, 790 (S.D. Ohio 2007) ("The ICCTA deregulated most sectors of road transport.").

Since the deregulation of the industry, numerous district courts in this circuit have held that state law claims for breach of an interstate shipping contract are not pre-empted by federal law. *See Cent. Transp. Int'l*, 356 F. Supp. 2d at 788 (holding that "[n]o part of the [ICCTA] prevents a state law claim on contract by a motor carrier for unpaid shipping charges"); *Arctic Express*, 366 B.R. at 792 n.2 (noting that the state causes of action are not pre-empted by federal law); *Con-Way Transp. Servs., Inc. v. Autosports Unlimited, Inc.*, No. 1:04-570, 2007 WL 2875207, at * 7 (W.D. Mich. Sept. 28, 2007) ("Under the post-deregulation statutory scheme, federal courts have concluded that a carrier's suit to collect unpaid charges for freight transportation services is a state law contract action . . . rather than a federal action."); *CGH Transp., Inc. v. Quebecor World, Inc.*, No. 05-209, 2006 WL 1117659, at * 2 (E.D. Ky. April 24, 2006) (noting that the plaintiff's breach of contract claims were not pre-empted by federal law).

Significantly, the Sixth Circuit seemingly approved of this post-deregulation approach in *CGH Transport v. Quebecor World, Inc.*, 261 Fed. Appx. 817 (2008). There, the court affirmed the district court's opinion, which explicitly had stated that a breach of contract claim premised on interstate shipping services was not pre-empted by federal law. *See* 2006 WL 1117659, at *2. The Sixth Circuit did not openly address the issue of preemption, but instead focused on whether a federal statute of limitations applied to the plaintiff's state law claims. 261 Fed. Appx. at 821. This necessarily implies, however, that the Sixth Circuit agreed with the district court that the state law claims were not pre-empted; otherwise, the statute of limitations issue would have been moot.

This Court is certainly aware that *American Synthetic Rubber* and similar cases are still technically good law. Nonetheless, in light of Congress' deregulation of the trucking industry in 1995, the way other district courts in this circuit have addressed pre-emption in this area since then, and the Sixth Circuit's very recent opinion in *CGH Transport*, the Court concludes that Plaintiff's state law breach of contract claim is not pre-empted by federal law.

Defendant also argues that Plaintiff's claim must fail because 49 U.S.C. § 14101 "provides that the Carmack Amendment under the ICCTA is the 'exclusive remedy' for an alleged breach of contract claim arising out of transportation services." (Def.'s Mot. at 16.) What this section actually provides is that "[t]he exclusive remedy for any alleged breach of a contract entered into under this subsection shall be an action in an appropriate State court or United States district court." 49 U.S.C. § 14101(b)(2). As Plaintiff filed this claim in an appropriate State court, and the claim is now before this district Court, Plaintiff is within the bounds of § 14101.

### g. Time-Barred

Defendant's final affirmative defense is that Plaintiff's claim is time-barred. This defense is based on statutory law and on the terms of the contracts. First, Defendant argues that Plaintiff's state law claim is governed by the statute of limitations found at 49 U.S.C. § 14705. The Sixth Circuit recently held that the limitations period in § 14705(a) applies to state law breach of contract claims that arise out of shipments for goods transported across state lines. *CGH Transp.*, 261 Fed. Appx. at 821; *see also Arctic Express*, 366 B.R. at 793 (holding that § 14705(a) applied to state law breach of contract claim for the interstate transportation of goods). The holding was limited to interstate

16

shipments because § 14705(a)'s reach is limited to shipments across state lines.[6]  49

U.S.C. § 14705(a).  Thus, there is a clear jurisdictional basis by which to apply the federal

statute of limitations to state law claims.  In this context, then, it follows that even though

state law claims "are not preempted by federal law[, that] does not preclude the defendants

from relying on federal law to provide an affirmative defense."  *Arctic Express*, 366 B.R.

at 792 (quoting *CGH Transp.*, 2006 WL 1117659, at * 2)).

§ 14705(a) does not apply to Plaintiff's claim, however, since Plaintiff is not a carrier

and does not seek to recover charges for services provided.  § 14705(b), on the other

hand, provides that "[a] person must begin a civil action to recover overcharges within 18

months after the claim accrues."  Unlike subsection (a), subsection (b) is not limited by its

terms to interstate shipments, and, to date, only two courts have addressed whether the

limitations period in subsection (b) applies to state law claims.  They reached different

conclusions.  In *Learning Links, Inc. v. UPS of America, Inc.*, No. 03-7902, 2006 WL

785274, at * 5 (S.D.N.Y. March 27, 2006), the court held that because the plaintiff's state

law breach of contract claim was not pre-empted by federal law, the defendant's

"suggestion that the eighteen-month statute of limitations applies is incorrect."  The court

expanded on its reasoning when it denied the defendant's motion for reconsideration.

*Learning Links, Inc. v. UPS of Am., Inc.*, No. 03-7902, 2006 WL 2466252 (S.D.N.Y. Aug.

24, 2006).  There, the court held that "Congress clearly intended the statute of limitations

under Section 14705(b) to apply only to claims brought under the statutory section

---

[6]§ 14705(a) applies only to "[a] carrier providing transportation or service subject to jurisdiction under chapter 135."  Chapter 135, in turn, provides for jurisdiction where goods are transported across state lines.  49 U.S.C. § 13501.

immediately preceding it." *Id.* at * 2. The court therefore held that the limitations period did not apply to the plaintiff's state law claim.

This reasoning was rejected in *Barber Auto Sales, Inc. v. UPS, Inc.*, 494 F. Supp. 2d 1290 (N.D. Ala. 2007). In that case, the court rejected the plaintiff's argument that the limitations period in § 14705(b) applies only to claims brought under federal statutes. *Id.* at 1294. The court held that because nothing in the text indicates that the limitations period is limited to federal claims, it applies to state law breach of contract claims. *Id.* at 1295.

This Court agrees with the conclusion reached in *Learning Links*, although it does not concur with the reasoning employed in that opinion. The *Learning Links* holding was based on the court's conclusion that the plaintiff's breach of contract claim did not involve "overcharges" as that term is used in the statute. 2006 WL 2466252, at * 2. The court noted that "the term 'overcharge' is not expressly defined" by statute, yet nonetheless concluded that "overcharge claims" are only those in which the defendant allegedly charged more than a published tariff rate. *Id.* Under Michigan law, however, "we give undefined statutory terms their plain and ordinary meanings. In those situations, we may consult dictionary definitions." *Koontz v. Ameritech Servs., Inc.*, 645 N.W.2d 34, 39 (Mich. 2002) (internal citation omitted). The plain and ordinary meaning of the term "overcharge" is "to charge too much or too fully." Merriam-Webster's Collegiate Dictionary 829 (10th ed. 1993). Accordingly, the Court concludes that the term "overcharge" as used in § 14705(b) encompasses Plaintiff's breach of contract claim in this case.

Despite this conclusion, the Court also disagrees with the court's holding in *Barber Auto Sales* that § 14705(b) applies to all state law claims. Although the *Barber* court did not specify whether the plaintiff's claims were based on intrastate or interstate shipments,

the court's reasoning suggests that its holding would extend § 14705(b)'s reach to all state law claims, whether those claims are based on intra- or inter- state shipments. This Court, however, concludes that § 14705(b) applies only to interstate shipments. There is simply no jurisdictional basis for a federal statute of limitations to apply to a state law claim that is premised upon the purely intrastate transportation of goods. Indeed, the statutes relevant to this issue are found in Subtitle IV of Title 49, which is titled "Interstate Transportation." The Court therefore holds that the limitations period set forth in § 14705(b) applies to Plaintiff's breach of contract claim insofar as that claim is based on the interstate shipment of goods. Accordingly, with respect to interstate shipments, Plaintiff's claim is limited to those delivered or tendered for delivery on or after May 4, 2003. To the extent that Plaintiff's claim is based on the purely intrastate shipment of goods, the limitations period in § 14705(b) does not apply.[7]

Defendant also argues that Plaintiff's claim is barred by the terms of the 2005 contract, which states that "[s]ettlement on all rates and charges will be finalized within one hundred eighty (180) days from date of shipment and thereafter neither [Plaintiff] nor RTM nor [Defendant] will have any legal rights of recovery." (Pl.'s Resp., Ex. M ¶ 10.) The 2005 agreement went into effect on June 30, 2005. (Def.'s Mot., Ex. 3; Pl.'s Resp., Ex. M.) Plaintiff filed its initial complaint on November 4, 2005. (Docket Text # 1.) This was less than 180 days from the date of the 2005 contract. Accordingly, any claims that accrued under that contract were pursued in a timely manner by Plaintiff.

---

[7]The relevant state law statute of limitations applies to the intrastate shipments. The parties did not address this issue in their briefs.

In sum, Defendant breached the contracts when it billed milk runs as individual trips. Accordingly, Plaintiff's motion for partial summary judgment is GRANTED with respect to its breach of contract claim. Additionally, however, the 18 month limitations period from § 14705(b) applies to Plaintiff's claim insofar as that claim is based on the interstate shipment of goods. As a result, the claim is limited to all intrastate shipments as well as interstate shipments delivered or tendered for delivery on or after May 4, 2003. Defendant's motion for partial summary judgment is GRANTED with respect to interstate shipments that were delivered or tendered for delivery before that date.

**B. Defendant's Counter-claim**

Defendant's counter-claim is premised upon Plaintiff's alleged breach when it stopped paying Defendant's "invoices dating back to late July, early August 2005." (Def.'s Mot. at 5.) The parties have not sufficiently briefed this issue, and the Court will not rule on it in this opinion and order.

**IV.  Conclusion**

For the above stated reasons, Defendant's motion for partial summary judgment is GRANTED with respect to Plaintiff's breach of contract claim insofar as it relates to interstate shipments delivered or tendered for delivery before May 4, 2003. Defendant's motion is DENIED with respect to Plaintiff's breach of contract claim as it relates to intrastate shipments and to interstate shipments delivered or tendered for delivery on or after May 4, 2003. Plaintiff's cross-motion for partial summary judgment is GRANTED with respect to its breach of contract claim insofar as it relates to intrastate shipments and to interstate shipments delivered or tendered for delivery on or after May 4, 2003. Plaintiff's

motion is DENIED insofar as it relates to interstate shipments delivered or tendered for

delivery before May 4, 2003.


                    s/Nancy G. Edmunds
                    Nancy G. Edmunds
                    United States District Judge

Dated:  July 1, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 1, 2008, by electronic and/or ordinary mail.

                    s/Carol A. Hemeyer
                    Case Manager